**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ENGINEERED ABRASIVES, INC.,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No. _____** |
| **AMERICAN MACHINE PRODUCTS & SERVICE INC., EDWARD RICHERME, KAREN RICHERME and EDWARD C. RICHERME,** | |
| **Defendants.** | |

**COMPLAINT**

Plaintiff Engineered Abrasives Inc. ("EA"), for its Complaint against Defendants American Machine Products & Service Inc. ("AMPS") and Edward Richerme, Karen Richerme and Edward C. Richerme, ("Richermes") (AMPS and Richermes collectively "Defendants"), herein alleges:

**PARTIES**

1.      Plaintiff EA is an Illinois corporation with its principal place of business located at 11633 S Austin Ave, Alsip, IL 60803.

2.      Defendant AMPS is an Illinois corporation with its principal place of business located at 11863 Josephine Drive, Mokena, IL 60448 ("Richermes' Residence").

3.      All three (3) Defendants Edward Richerme, Karen Richerme and Edward C. Richerme (the "Richermes") reside at the same address as AMPS, the Richermes' Residence. The Richermes jointly and severally operate AMPS, all have access to and

**-1-**

use the single AMPS email address <ericherme@ampsabrasives.com> ("AMPS email") and represent themselves as AMPS. Upon information and belief, the Richermes dominate and control all of the affairs of AMPS and are each personally responsible for contacting customers, filling orders, creating, approving, publishing and/or disseminating all material used to promote AMPS, including the false and disparaging claims that violate the rights of EA and are the subject of this action, as discussed further below.

## JURISDICTION AND VENUE

4.      This action arises under the laws of the United States and under Illinois law.

5.      This action is brought pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); Illinois statutory law, 815 ILCS 505 and 815 ILCS 510/2; and the common law of unfair competition, defamation, product disparagement, commercial disparagement, and tortious interference.

6.      This court has personal jurisdiction over the Defendants because they reside and are doing business in this judicial district and because they have committed tortious acts and caused tortious injury in this district.

7.      This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§1331, 1338 and 15 U.S.C. §1121 because the complaint states claims that arise under federal law and present federal questions. The court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. §1367.

8.      Venue is proper in this district pursuant to 28 U.S.C. §1391 (b) and (c) because the defendants reside and are doing business in this judicial district, and a substantial part of the events giving rise to the claims occurred in this district.

**BACKGROUND FACTS**

9. EA is well known in its industry as a designer, innovator and manufacturer of high quality, highly reliable automated shot peening and blast finishing equipment, and related replacement parts, and supplies, as well as the very personal, highly responsive, and proactive service provider for such equipment including installation, maintenance and repair services ("EA's Business").

10. EA has been engaged in EA's Business for over 45 years and three generations of the owner's family, and has built a strong reputation for EA's Business and manufacturing and selling high quality equipment, parts and highly effective and responsible service related thereto.

11. EA and AMPS are competitors in the automotive shot peening industry.

The Parties' Prior Relationship

12. From 1982 to 2011, Defendant Edward Richerme was an employee of EA and performed duties as a machine technician, builder, designer and machine tester. He also was a plant superintendent, supervising EA's manufacturing process. Defendant Edward Richerme did all of this work for the benefit of EA and was one of EA's highest paid employees. In 2009, Edward Richerme and his wife, Karen Richerme, incorporated and were officers of ER Parts Inc. ("ER Parts"). ER Parts operated from the Richermes' Residence from January 2009 until April 2009 as a short-lived experiment by EA to have a separate parts fulfillment company for EA products. By virtue of his employment with EA and ownership of ER Parts, Edward Richerme became familiar with EA's equipment, pricing, parts, and customers.

**-3-**

13.     Defendant Karen Richerme and her husband co-owned a printing business, Carbon Copy, which they also operated from the Richermes' Residence.[1] Through Carbon Copy, Karen and Edward Richerme were hired by EA to make copies of EA documents for use by EA. By virtue of her work through Carbon Copy and her ownership interest in ER Parts, Karen Richerme was familiar with EA's equipment, parts, pricing and customers.

14.     From 1992 to 2011, Edward C. Richerme, the son of Karen and Edward Richerme, was employed by EA as a machine technician and builder. By virtue of his employment with EA, Edward C. Richerme became familiar with EA's equipment, pricing, parts, and customers.

15.     In September 2011, Defendant Edward Richerme abruptly left EA's employment. After September 2011, EA no longer hired Karen Richerme or Carbon Copy for EA printing jobs.

16.     The following month, October 2011, Edward C. Richerme was terminated from EA.

17.     On information and belief, the Richermes, while still working for EA, took steps to create AMPS, a company designed to compete directly with EA, targeting EA customers and using EA products covertly retained by the Richermes from Edward and Karen Richerme's ER Parts business.

18.     AMPS banking accounts were opened in September 2011, while Defendants Edward Richerme and Edward C. Richerme were still employed by EA.

---

[1] Karen Richerme maintained an email for Carbon Copy at carboncp@yahoo.com and often copied herself on emails sent from the AMPS email.  See attached **Exhibit A**. Karen Richerme was also copied at the Carbon Copy email on AMPS promotional emails. See attached **Exhibit B**.

19.     Since its inception, all the Richermes have been and continue to be active in managing, promoting and operating the business of AMPS.[2]

Prior Litigation & Bankruptcy Filings

20.     On October 11, 2013, EA filed a lawsuit against AMPS, Edward Richerme, and Edward C. Richerme (the "Defendants") in the U.S. District Court for the Northern District of Illinois, captioned as *Engineered Abrasives Inc. v. Edward Richerme et al.*, Case No. 1:13-cv-07342, alleging trademark and copyright infringement, unfair competition, and deceptive trade practices (the "Prior Case").[3]

21.     After the District Court entered default in the Prior Case, the Court ordered discovery to be conducted, including substantial document production, numerous depositions, and a forensic examination of Defendants' computers.

22.     On August 5, 2014, Edward Richerme filed a voluntary petition for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois (Case No. 14-28683).

23.     On September 12, 2014, the Bankruptcy Court entered an order, on EA's motion, granting relief from the automatic stay, permitting EA to proceed with an evidentiary hearing in the District Court.

24.     The District Court conducted a daylong evidentiary hearing on November 21, 2014.

---

[2]   Copies of emails sent by each of the Richermes on behalf of AMPS from the AMPS email are attached as **Exhibit C** (Edward Richerme), **Exhibit D** (Karen Richerme) and **Exhibit E** (Edward C. Richerme).
[3]   At the time the complaint for the Prior Case was filed, EA was not aware of the covertly retained products from ER Parts or Karen Richerme's involvement in AMPS. Because default was entered promptly against the original Defendants, Karen Richerme could not be added as a Defendant in the Prior Case.

25.     On March 18, 2015, following the completion of discovery and after the evidentiary hearing, the District Court issued its Opinion and Order. In its Opinion and Order, the Court awarded EA $207,257 in monetary damages, $499,088.80 in attorneys' fees, $668.24 in costs, and entered permanent injunctive relief to prevent Defendants from infringing EA's trademarks and requiring Defendants to return to EA certain products and materials in their possession. The Court also sanctioned Defendants for their conduct during discovery, and required them to reimburse EA for $12,800 incurred in conducting a forensic examination of Defendants' computers. See Prior Case, CM/ECF No. 117.

26.     In the Opinion and Order, the District Court specifically noted a prior defamatory email sent by Defendant Edward C. Richerme to numerous individuals at Ford, including its executive chairman and president and EA contacts, and the efforts required by EA to address the allegations.

27.     On March 19, 2015, the District Court entered judgment against the Defendants, jointly and severally, in the amount of $719,814.04.

28.     On May 5, 2015, Edward C. Richerme and AMPS each filed for Chapter 11 bankruptcy protection in the United States District Court for the Northern District of Illinois, Case Nos 1:15 BK 16083 and 1:15 BK 16038 (respectively).

29.     On July 17, 2015, the Bankruptcy Court entered orders, on EA's motions, granting relief from the automatic stay in both Chapter 11 proceedings.

30.     As described in more detail below, this proceeding is based entirely upon the wrongful conduct of Defendants after the date of the bankruptcy petitions filed by

Edward Richerme, Edward C. Richerme and AMPS. Accordingly, the automatic stay does not prevent EA from filing this proceeding.

EA's Shot Peening and Blast Finishing Equipment

31.    EA has been a leader in the shot peening industry for nearly half a century, and three generations of the Wern family, EA founders and owners.[4] EA researches, designs, develops, fabricates, sells, installs and maintains specialized shot peening equipment for the vast majority of the U.S. automotive industry and the automotive component supplier segment of the market. Some of EA's equipment can be quite large and quite expensive costing upwards of $1,000,000 per unit. This equipment requires a significant upfront investment in materials and customized professional services to produce each unit.

32.    EA also provides job shop peening services for many of the same customers using its own EA manufactured peening equipment. The EA peening equipment pressurizes a source of peening media such as very small metal spheres or "shot". The EA equipment controllably sprays the shot under relatively high pressure to direct it against a work piece, for example an automotive drive train component such as a gear. Pressurized peening with the shot alters the surface material properties to strengthen the material and dramatically improve the life and reliability of the component.

33.    The EA equipment utilize customized pressure vessels the size of a small car to contain and manage the flow of peening media or shot under pressure. EA has invested substantial time and resources in developing and sourcing components for its

---

[4] In 2015 Mike Wern, current President of EA, was recognized as Shot Peener of the Year from the industry leading publication Shot Peener.

high-quality shot peening equipment, including the pressure vessels used in that equipment, and promoting and selling those products to its customers.

34. EA has a reputation for manufacturing and selling equipment that adheres to or establishes the highest standards of safety and quality. EA's reputation for safety and quality is instrumental to EA's success in a highly competitive marketplace.

35. EA uses Schmidt pressure vessels manufactured by Axxiom Manufacturing Inc. ("Axxiom") in its equipment. Axxiom is recognized as an industry leader in the manufacturing of such components. EA purchases these components from Axxiom and has done so for many years. The pressure vessels are formed of extremely heavy plate steel with components welded to that vessel. The vessels purchased from Axxiom are certified to meet or exceed industry standards and safety requirements for such vessels.

36. The pressure vessels utilized by EA attaches a component to the exterior top portion of these vessels to help contain the shot or peening media as it is introduced into the vessel. This component is in the form of a metal cone positioned on top of the pressure vessel. As part of the attachment process, a flange is welded to the pressure vessel. The flange is used with a gasket to attach and seal the cone to the top of the pressure vessel. In this manner, media flowing to the vessel can be contained and dust or other particulate matter can be contained as required by OSHA standards. The attachment of the flange to the pressure vessel occurs "outside of the envelope" or area which contains the pressurized media and as such produces no risk to the integrity of the pressure vessel.

37. For cost savings reasons, since 2012, the welding of the flange to the pressure vessel is done by Axxiom for EA.

38. EA sells a substantial amount of automated shot peening and blast finishing equipment that utilizes pressure vessels to customers in the specialized automotive shot peening industry. In this highly specialized industry, the majority of EA business and sales are directed to its top 10 customers. Dana Holding Corporation ("Dana") is one of EA's top 10 customers.

39. Dana has been a customer of EA since 1998 and EA has sold several shot peening units to them and provided ongoing services for Dana's Mexico, Fort Wayne, Indiana, Cape Girardeau, Missouri, and China manufacturing facilities.

40. Automotive shot peening is a narrow, highly specialized industry with a limited number of customers and suppliers. A supplier's reputation in such an industry is of paramount importance. The reputation developed by EA was developed over nearly a half-century of customer relationship building and marketing by three generations of the Wern family.

41. AMPS has been and is currently competing with EA in the narrow market for automotive shot peening and blast finishing equipment, including equipment that utilizes pressure vessels. AMPS has specifically been competing with EA for business from Dana.

Defendants' Misrepresentations Regarding EA's Products

42. EA and Defendants have been competing for business in the specialized automotive shot peening market in North America since at least March 2012, and continue to do so today.

-9-

43. For at least the past 2 years, Defendants have had actual knowledge that EA pressure vessels did not violate safety standards. In or around June 2012, less than one (1) year after leaving EA to run competing AMPS, Defendants contacted the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), and "reported" a number of alleged safety violations by EA. Among the alleged violations reported was an improper weld on pressure vessels used in EA equipment which, according to Defendants, created a safety issue. The weld involved the attachment of the flange to the pressure vessel – outside the envelope -- as mentioned above used to contain shot and particulate matter to meet and maintain OSHA standards.

44. OSHA investigated the claims made by Defendants, and found that EA had committed no citable safety violation in the attachment of the flange to the pressure vessel.

45. Upon information and belief, Defendants were aware, at the time they made the complaint to OSHA and certainly after OSHA completed its investigation, that EA had committed no safety violations.

46. Upon information and belief, Defendants were specifically aware that there was no safety issue with the pressure vessels used by EA.

47. When AMPS began competing with EA, one of its primary customer targets was Dana, which has been an EA customer for nearly two decades and continues to be a customer of EA.

48. While offering EA products covertly retained from ER Parts, AMPS was initially successful in luring some of Dana's business away from EA. However, Dana recently decided to stop working with AMPS and began shifting business back to EA.

49.     On or around July 21, 2015, Defendants, contacted several representatives of Dana from the AMPS email account and made false representations about the performance of EA equipment. Specifically, Defendants falsely accused EA of knowingly manufacturing and distributing equipment that does not meet code, fails to carry requisite certifications, and fails to meet industry standards (the "July 2015 e-mail"). A copy of the July 2015 e-mail is attached hereto as **Exhibit F**.

50.     In the July 2015 e-mail, Defendants made the following representations:

a.  that certain pressure vessels used in EA equipment were altered and "never done to code or certified after the alterations";

b.  that EA is a "non-code shop";

c.  that "this was not a small issue, basically it renders the pressure vessels scrap and unsafe";

d.  that because of the pressure vessels (also referred to as "tanks") used by EA, "the tanks can rupture or explode causing serious injury or possible death to anyone working on or near the tanks";

e.  that EA altered the pressure vessels "fully knowing it would compromise the strength and safety of the tanks."

51.     Each of the above representations is false and defamatory.

52.     Defendants knew or should have known that each of the above representations were false and defamatory.

53.     Defendants made each of the above representations with the specific intent to harm EA and its business relationship with Dana and promote AMPS as a source for Dana's shot peening parts and service.

-11-

54.     Upon information and belief, Defendants made each of the above representations with malice and in retaliation for: (i) EA's obtaining a judgment against Defendants in the Prior Case, and (ii) AMPS losing Dana's business to EA.

55.     AMPS sent the July 2015 e-mail to Dana, which is both a current and potential customer of both EA and AMPS. The purpose of AMPS' July 2015 e-mail was to promote AMPS products and services over EA products and services.

56.     The July 2015 e-mail was sent to representatives of Dana who are in a position to influence and control the purchase of products from suppliers such as EA and AMPS.

57.     It was not unusual for each of the Richermes to use e-mail from the AMPS email account to promote their business and products.  In fact, upon information and belief, the bulk of Defendants' advertising and promotion efforts were conducted via e-mails sent by Defendants from the AMPS email account to customers and potential customers.

58.     The July 2015 e-mail was disseminated to a potential customer as part of AMPS' efforts to promote its business, and was distributed in interstate commerce.

59.     Upon information and belief, each of the Defendants was personally involved in promoting AMPS products to Dana, including promoting such products by e-mail from the single AMPS email address.

60.     Shortly after Defendants sent the July 2015 e-mail, EA was contacted by Mike Young, an engineer at Dana, who expressed serious concern over the quality and safety of EA's equipment and demanded assurances from EA in order to continue to do business with EA.

-12-

61.    EA's owner, Mike Wern, took immediate action to stop the harm caused by Defendants' false and defamatory representations about EA products and safety, traveling to Dana facilities to provide assurances and provide proof of safety compliance.

62.    The harm caused to EA's business relationships and reputation in the industry by Defendants' false and defaming representations is not yet quantifiable.

63.    Given the narrow and specialized nature of the automotive shot peening industry, and the limited number of customers and suppliers in such industry, Defendants' defamatory statements regarding EA and its products reached a substantial segment of that industry.

64.    While EA worked hard to alleviate Dana's concerns, EA's reputation, both with Dana and in the automotive shot peening industry generally, has been significantly damaged by Defendants' false and defamatory assertions.

65.    The false and defamatory statements in the July 2015 e-mail were injurious to EA.

66.    Defendants' actions were malicious, willful, motivated by personal animus and the intent to harm EA, and fall far outside the realm of acceptable corporate practices.

## COUNT I

### False and Misleading Statements – 15 U.S.C. §1125

67.    EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

68.    Section 43(a) of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce . . .

any false or misleading description of fact, or false or misleading representation of fact, which –

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities . . . of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.  15 U.S.C. § 1125 (a).

69.     In the course of promoting AMPS to at least one customer, as described above, Defendants have made false or misleading representations of fact regarding EA's business practices and the nature, characteristics, and qualities of EA's products.

70.     Upon information and belief, Defendants continue to make false and misleading statements about EA's products and business practices.

71.     Defendants' promotion of AMPS and its products through written and other communications to Dana constitutes commercial advertising or promotion within the meaning of the Lanham Act.

72.     The claims made by Defendants actually deceive or have a tendency to deceive a substantial segment of the relevant industry audience, including Dana.

73.     The deception caused by Defendants' false and misleading representations of fact and claims is material and likely to influence the purchasing decisions of customers, including Dana.

74.     By asserting and disseminating the false claims to a customer/potential customer, Defendants have caused the false statements to enter interstate commerce.

75.     Defendants' false and misleading representations and claims, made in the course of their promotion of AMPS, constitute a violation of 15 U.S.C. § 1125(a).

-14-

76.     As a result of Defendants' conduct, EA has been and will continue to be injured by, among other things, damage to its reputation, loss of goodwill associated with EA's business and products, and the direct diversion of sales from itself to Defendants.

77.     As a direct and proximate result of Defendants' actions, EA has been and is likely to continue to be damaged, entitling EA to remedies and compensation as provided in 15 U.S.C. §§1114, 1116 and 1117.

78.     EA has no adequate remedy at law for Defendants' violations and is being irreparably harmed by Defendants' actions which, unless enjoined, will continue.

79.     In addition to other remedies, EA is entitled to injunctive relief against Defendants.

## COUNT II

## Commercial Disparagement

80.     EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

81.     Defendants' statements in the July 2015 e-mail falsely accuse EA of knowingly selling unsafe products and engaging in business misconduct, impute EA's integrity, and constitute defamation per se.

82.     At the time Defendants made the false and misleading statements about EA's business, Defendants knew or should have known the statements were false.

83.     Defendants made the false and misleading statements with knowledge of their falsity or, at a minimum, with reckless disregard for the truth.

84.     Defendants' defamatory statements harm the reputation, goodwill and character of EA's business.

-15-

85.     Defendants' false statements were knowingly false and malicious, and intended to cause harm to EA.

86.     EA has been, and will continue to be, harmed by Defendants' false and defamatory statements.

## COUNT III

## Product Disparagement

87.     EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

88.     Defendants' statements in the July 2015 e-mail falsely assert that EA products are improperly altered, unsafe, lack necessary certifications, and are of poor quality.

89.     At the time Defendants published the false and misleading statements about EA's products, Defendants knew or should have known the statements were false.

90.     Defendants made the false and misleading statements with knowledge of their falsity or, at a minimum, with reckless disregard for the truth.

91.     Defendants' defamatory statements harm the reputation and character of EA's business, and reduce the marketability of EA's products.

92.     Defendants' false statements were knowingly false and malicious.

93.     As a result of Defendants' false statements regarding EA products, EA has been injured and will continue to be injured in the marketplace.

## COUNT IV

## Common Law Unfair Competition

94.     EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

95.     Defendants' false and defamatory claims referencing EA products and business practices were intentional and made in an effort to compete with EA unfairly.

96.     Defendants' have unfairly competed with EA by the acts complained of and have caused and will continue to cause irreparable harm, damage and injury to EA unless Defendants are enjoined.

## COUNT V

## Uniform Deceptive Trade Practices Act

97.     EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

98.     Defendants have engaged in deceptive trade practices by disparaging the goods and business of EA by false and misleading representations of fact contained in the July 2015 e-mail.

99.     Defendants' actions violate the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

## COUNT VI

## Consumer Fraud and Deceptive Business Practices Act

100.     EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

101.     Defendants engaged in unfair methods of competition and unfair and deceptive acts or practices by using deception, fraud and misrepresentation of material facts, as specified in the conduct described above.

102.     Specifically, Defendants' act of sending the July 2015 e-mail, which contained false and defamatory statements about EA's products and business, was unfair and deceptive.

103.     Defendants' unfair and deceptive statements were made in the course of promoting AMPS products, which conduct involved trade or commerce.

104.     Defendants intended for Dana to rely on the misrepresentations contained in the July 2015 e-mail.

105.     Defendants have caused, and are likely to cause, a public injury and detrimental effect on consumers misled and misinformed by the July 2015 e-mail.

106.     Defendants' conduct has caused or is likely to cause consumers, including Dana, to purchase fewer products from EA than such consumers would have purchased absent Defendants' conduct, and has caused and is likely to continue to cause a loss to EA's goodwill and reputation, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505.

## COUNT VII

### Tortious Interference With Prospective Economic Advantage

107.     EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

108.     As competitors in the automotive shot peening industry, there is overlap in the customers and potential consumers of EA and Defendants.

109.     Dana was a customer of both EA and AMPS.  AMPS was aware of EA's ongoing business relationship with Dana.

110.     EA had a reasonable expectation of continuing to enter into business relationships with shot peening consumers, including Dana.

111.     Defendants knew that EA had a reasonable expectation to continue entering into business relationships with consumers, including Dana.

112.     As described above, in July 2015, Defendants intentionally disseminated and published an email, intended to promote AMPS products,  which accused EA of violating code and certification requirements and manufacturing unsafe products which posed a substantial threat to customers' health and safety.

113.     The July 2015 e-mail contained false and disparaging representations about EA and its products, and has interfered with EA's reasonable expectation of entering into business relationships with customers, including Dana.

114.     Defendants' acts, directed to consumers in the narrow automotive shot peening industry, have interfered and will continue to interfere with EA's reasonable expectation of entering into business relationships with current and potential customers.

115.     Defendants' false representations have caused or may cause current customers to discontinue purchasing products from EA and/or prevent potential customers from purchasing products from EA.  In fact, Dana has already expressed concern about the safety of EA's products after receiving the July 2015 e-mail.

116.     EA has been and will continue to be injured by Defendants' conduct.

## Count VIII

## Defamation

117.    EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

118.    Defendants' written statements, described above, contain false, misleading, and disparaging statements.

119.    Defendants' made these statements with knowledge of their falsity or, alternatively, with reckless disregard for the truth.

120.    Defendants' statements state or imply that EA has manufactured and sold unsafe products, has failed to comply with applicable business codes, is not being honest with customers, and lacks integrity in its business practices. These statements are harmful to EA's reputation, product potential, and business.

121.    Third parties, including customers and potential customers in a position to purchase EA's products, received, heard, and read these false, deceptive, and misleading statements.

122.    The third parties who received such statements understood them in a way that defamed EA and caused injury to the professional reputation of EA.

123.    These defamatory statements constitute defamation per se as they accuse EA of violating applicable business codes, fraud, and a lack of business integrity.

124.    The defamatory statements clearly and directly injure EA's professional reputation by imputing to it improper and dishonest conduct and by misrepresenting the quality and nature of EA's goods and business.

125.    The purpose and effect of the defamatory statements has been to injure EA by hindering its ability to market and sell its products.

126.    As a direct and proximate result of Defendants' publication of false, deceptive, and misleading statements, EA has suffered and will continue to suffer losses to its reputation and general and special damages in an amount to be proven at trial.

127.    Defendants have made the false, deceptive, and misleading statements with malice, a willful intent to harm and injure EA's professional reputations, and with a conscious disregard of EA's rights.   As such, EA is entitled to an award of punitive damages.

128.    EA has no other adequate remedy at law for Defendants' continuing unlawful conduct. Such violations will continue unless and until this Court enjoins Defendants, its agents, officers, employees, and all persons acting in concert with Defendants, from engaging in any further defamatory conduct.

## Count IX

## Piercing the Corporate Veil/Alter Ego

129.    EA repeats and realleges the allegations in all previous paragraphs, as if fully set forth herein.

130.    Upon information and belief, the Richermes dominate and control all of the affairs of AMPS.

131.    AMPS is so closely and completely controlled by the Richermes that it is but a mere instrumentality or alter ego for those individuals.

132. The Richermes were personally responsible for creating, approving, publishing and/or disseminating all material used to promote AMPS, including the false and disparaging statements about EA contained in the July 2015 e-mail.

133. Treating AMPS separately from the Richermes and allowing them to escape the consequences of their actions would promote an injustice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Engineered Abrasives, Inc. requests that this Court award the following relief:

A. Preliminarily and permanently enjoin and restrain AMPS and the Richermes, and all officers, agents, servants, employees, directors, representatives, successors, assigns, related companies, those in privity with Defendants or in active concert or participation with Defendants from making any false or misleading claims in relation to EA, EA's business practices or EA products;

B. Award an accounting for, and enter judgment against Defendants, joint and several, for Defendants' profits and EA's lost profits proximately caused by Defendants' false and misleading representations;

C. Award EA punitive damages to compensate for Defendants' malicious conduct and to deter such misconduct by Defendants in the future;

D. Award EA an increase in the award of damages, up to three times the amount found, for deliberate and willful false advertising and promotion pursuant to 15 U.S.C. § 1117;

E.      Require Defendants to pay the costs of this action, together with EA's attorney fees and disbursements incurred herein;

F.      Award EA pre-judgment and post-judgment interest;

G.      Require Defendants, pursuant to 15 U.S.C. §1118, to destroy all materials that contain copies of the false advertising and promotion claims and statements; and

H.      Award EA such other and further relief, as this Court deems just and equitable.


JURY DEMAND

EA demands a trial by jury on all matters subject to decision by a jury.

Dated:  August 10, 2015

Respectfully submitted,

**ENGINEERED ABRASIVES, INC.**


By:     /*Joan L. Long*/
One of Their Attorneys

Joan L. Long
Grant H. Peters
**BARNES & THORNBURG LLP**
One North Wacker Drive
Suite 4400
Chicago, Illinois  60606-2833
Telephone:  (312) 357-1313
Facsimile:   (312) 759-5649

CHDS01 973809v1